Good morning, Your Honors. May it please the Court. This is the second time this case has come before this Court. It is a difficult one, involving systemic domestic violence and the safety of a young child hangs in the balance. At bottom, this appeal comes down to whether money and an Italian court order provide sufficient guarantees to protect a child and his mother from a serial abuser whose own expert testified to his violent tendencies, uncontrollable temper, and an inability to appreciate the consequences of his actions to his child. As the Court well knows, domestic violence is about power, and one spouse using that power to exercise physical and psychological control over the other. My client, Ms. Golan, is a young mother, a U.S. citizen who escaped her violent life in Italy at the hands of the appellee, Mr. Saada. She came to her home country with her then two-year-old son, who is a dual citizen of Italy and the U.S. Sending this child back to Italy, where his mother barely speaks the language and has limited resources and support, will only reinforce the notion that a wealthy, powerful man can continue to exert physical and psychological control over his abused wife so long as he says he'll abide by court orders and has the financial means to put some money on the table. There's no dispute in this case that return to Italy... It's not just that he says that he would comply with the court orders, right? The District Court specifically found that there was a history of compliance with court orders and with the investigation by the Italian authorities. Is that not right? I don't think that is right. I mean, there was not a series of court orders that he's ever complied with. He gave limited cooperation to a social services investigation back in 2017, but thereafter, he continued to abuse my client physically and psychologically. And so, you know, he has a history of violating the law. The entire course of conduct in this case by him reeks of violating the law. You know, the physical abuse, the psychological abuse is all in violation of the law. So I would submit there's no history of compliance with any authority in Italy. So the Hague Convention has the presumption in favor of return of the child to the place of habitual residence to determine custody, right? So if the presumption is that we trust the country of habitual residence to determine custody, wouldn't it be pretty remarkable for us to rule on the basis that an order by an Italian court is not going to be effective? So I think the answer to that question, Your Honor, is no. I mean, first of all, I think safety, the safety of the child trumps comedy. And we're not asking this court to make a decision or a determination about the competency or the ability of the Italian court to effectuate its order. The issue here and the issue that the court below got wrong was whether that order would have any impact on the abuser here, the petitioner. The only way that a protective order works is if it serves to deter the conduct that it's meant to prohibit. And in this case, the evidence at trial that was the basis of the grave risk finding and the evidence that the was found to be violent, to be impulsive. He did not appreciate the consequences of his action to his child. The risk to the child is that he was abusive toward Ms. Golan in the presence of the child, right? Well, that was the majority of the court order. The Italian court order, if it's Ms. Golan apart, can thereby avoid the risk of abuse. I think the key phrase in your question was if it is complied with. And I think that what the record at trial showed and what the petitioner's expert testified to is there's no factual basis to trust it will be complied with. You know, as the court found, he doesn't appreciate the consequences of his action. As soon as he doesn't comply, this is Judge Walker. As soon as he doesn't apply, your client goes into court, into Italian court and tells the judge that. And the judge then says, OK, then, you know, as far as I'm concerned, there's not going to be any custody for Mr. Sada. He's got every incentive to comply. And the problem is when they're together, he seems to go off, go unhinged. But there's a protective order in place. And there's no reason to think that. And the other thing about this case that's so different from many of these other cases in which return has been compelled is that we're not predicting that the court might enter a protective order. There is one in place in Italy. And therefore and the judge took extraordinary means to to accomplish that by contacting the Italian authorities to make sure that they were they would they would protect her. So this case is quite different from many other cases. And as Judge Benesci has pointed out, there's a presumption of return. The purpose of the convention is to return the child to the country of initial residence for determination of custody. And where a district judge has taken the measures that she's taken here and where we're reviewing for abuse of discretion, it seems to me that you have a difficult, a difficult argument to make. So let me make a couple of points, Your Honor, if I may. First of all, I think the purpose of the hate convention is also to protect the welfare and the safety of children. I think that can't be lost in the in the presumption of return. Your Honor started your question by, well, if he breaches the protective order, can't my client just run into court in Italy and, you know, have the court take care of that? Well, I don't mean to be morose, Your Honor, but what if he kills her? He has threatened to kill her. He has told her brother that if she comes back to Italy, she will leave in a pine box. If we wait for him to violate the protective order, it's too late. And so while I agree that the courts in the cases that we cited, like Davies and Simcox and Walsh, the protective order had not been put in place yet. The courts in those cases operated under the assumption that a protective order would be in place. And so I think the distinction between the fact that a protective order is already in place here but hadn't yet been put in places in those other cases is a distinction without a difference, because the courts in those cases assumed there would be one. And so I submit, Your Honor, that if we're waiting for him to actually violate the protective order, we've waited too long. And the record at trial was very clear that he is not a reliable actor who we can trust will abide by the protective order. What Your Honor says makes perfect sense, that a rational person would say, well, I'm not going to do something because here are the consequences. But his own expert testified that he doesn't appreciate the consequences, that he's impulsive, that he acts on a whim and has an incredibly violent temper. And so while in a rational world, Your Honor, what you're saying makes sense, it doesn't apply here. I mean, this is a petitioner, and I appreciate that we've submitted a lot of paper over the last two appeals, but this is a petitioner who is incredibly violent. I mean, the record in this case is shocking. I mean, the physical violence, the psychological, you know, punching, smashing her head against the dashboard, throwing the last bottle at her, threatening to kill her. Thank you. Thank you, Mr. Levy. So you've used up your time, but you've reserved two minutes for rebuttal. So we'll hear you again after hearing from opposing counsel. Mr. Mintz. Thank you, Your Honor. And it may please the court. The district court in this case, over the course of approximately 18 months, has now found twice that the child should be returned to Italy and would be sufficiently protected if returned to Italy. First, on March 22nd, 2019, the district court issued a decision that first, the child was the habitual resident of Italy, and second, even in the presence of a grave risk of harm, there were sufficient ameliorative measures that would protect the child if returned to Italy. The mother then appealed, and this court remanded for the purposes of evaluating whether there existed ameliorative measures that could be made enforceable in Italy prior to the child's return. The district court then spent approximately nine months evaluating the enforceability of those measures, taking to heart two suggestions that this court made in the remand order. The first suggestion was contacting the international network of Hague judges to determine what actions would be possible in Italy and to know whether or not certain orders would be made enforceable in Italy. And the second was to direct the parties to apply for a protective order in Italy. The district court did both of those things. Most importantly, they directed the parties to apply for a protective order in Italy, which the parties did. And in December 2019, the Italian court ordered several measures that would protect the child. Let me ask you one question about the way the Hague Convention works. I mean, the Hague Convention itself just says that if there's a grave risk of harm, the child does not need to be returned. So why shouldn't that, the finding of the grave risk, be the end of the analysis? Why do we do this where the district court coordinates with Italian courts and does a whole procedure? I mean, if we were applying the Hague Convention straight away, wouldn't we just say that there's a finding of grave risk means that the child doesn't need to be returned? Well, to answer that specific question, actually, the Hague Convention does not mandate that if the district court finds grave risk of harm, that the child should not be returned. It gives it discretion to either let the child remain in the United States or even in the presence of a grave risk finding, return the child to back to the country of habitual residence. Article 18 of the Hague Convention is the authority for that. And this court specifically stated in the remand order that the district court, quote, the district court is not necessarily bound to allow the child to remain with the abducting parents, end quote, even if the respondent were to establish one of the affirmative defenses. The language of the treaty specifically says that the district court is not bound to return the child, which means that this district court has discretion. And this court has recognized the district court's discretion to either allow the child to remain or to still order the return of the child, even in the presence of certain measures provision developed in the case law. And the Second Circuit has mandated that even in the presence of grave risk findings, the court is bound to examine the suite of undertakings possible to allow the child to return to the country of habitual residence in order to achieve the goals of the Hague Convention, which is a prompt return so that the child could be subjected to custody proceedings in that country. And right now there are custody proceedings going on in that country, in Italy. The next court appearance, I believe, is in December 2020. What should we do with the district court's finding that your client is not capable of changing his behavior and has not changed his behavior? And so even though he's being ordered to stay away from Ms. Golan, based on the district court's findings, there's reason for doubt that he'll actually do that. The district court made several findings, and they certainly made that finding. But in general, in the last order on May 5th, the district court specifically addressed that issue and said that they were not concerned with Mr. Sada complying with the provisions in Italy. The district court rejected appellant's arguments and cited the fact that the father had complied with all the orders already in place, has acted appropriately on all the supervised visitation. There's been no complaints on improper behavior on part of the father during the past two years of litigation in this case. And so the district court's factual findings on this issue are very clear. The district court was not concerned with the father complying with the orders of protection and all the various orders issued by the Italian court, which is distinguishable to the other cases, such as in Davies, where the district court found that there was a grave risk and found explicitly that the father in that case would likely not abide by any protective orders or any undertakings, and therefore found that no undertakings were sufficient to protect the child. This district court found the opposite. And, you know, that factual finding, there is no clear error in that factual finding. We believe that this court should uphold that. Moreover, these are issues that were raised on the first appeal. And this court considered the extent of the undertakings and clearly the two most important things. The compliance of Mr. Assata with the requirements is in the United States, right? So is it not possible to think that maybe his behavior would be different if the child is ultimately returned to Italy? And I guess connected to that, what are we supposed to do with the contention from Ms. Galan that Mr. Assata abused her even after social services investigations commenced in 2017? Well, again, these are all part of the record that the district court analyzed, evaluated, and, you know, made credibility determinations on. First off, I think, you know, we could all speculate as to what may or may not happen in Italy, but I think the record is clear, and I think that district court's factual findings on this are clear, that the district court did not believe that there was a real risk that Mr. Assata would violate these orders. And not only is there not a real risk of that happening, but the ramifications of that would be severe. As one of the judges previously stated, Mr. Assata would effectively lose custody. He spent two years, spent exorbitant amounts of money litigating this case. He has to pay Ms. Galan $150,000 prior to the child's return to Italy. For Mr. Assata to pay all that money, to spend all this time, to basically eliminate any possibility that he would have a continuing relationship with his son, which all experts in this case, the factual findings support, that the father and the son had a very loving relationship, a very strong loving relationship on all those supervised visitations. For him to take that risk would be completely illogical and is certainly not supported by the record. I think that the district court made several factual findings. We've spoken about ameliorative measures in terms of whether there's a sufficient guarantee that they're going to be complied with and that it's going to reduce the grave risk of harm. So you're saying the sufficient guarantee here is Mr. Assata's incentives in getting custody of his child? Well, number one, we know that the orders are already in place. So there is going to be oversight in Italy. This is not based upon, as so many prior cases have been, on promises made by the left behind parent, by the abuser. These are not promises that the district court simply has to just trust will be complied with. These are court orders that the father will have to comply with or be found in violation and suffer serious consequences. Certainly, one can imagine, again, reciting the facts that I did before, that a loving father would not take any risk to remove himself from his child's life by violating orders in the middle of a custody proceeding, especially when he has spent significant resources and time. That was a risk to him when the social services investigations were happening, right? Sure. But the social services, I mean, the record is clear. The social services record ended with the parties essentially making up and saying that they were in a better place and were in a loving relationship. So social services did their job. The social services ended. And the district court said the main issue in this case was when the parties were together. It was a volatile relationship. And although the district court found that most of the abuse happened from the father to the mother, the district court did not say that the mother was not physically or was not abusive towards the father because she was. And so the volatility of this relationship is what posed the problem to the child. The fact is, when the mother and the child go back to Italy, the parties will not be together. They will not be in physical proximity. They will not be in a relationship. What about the argument of opposing counsel that even if the Italian authorities might enforce the order should Mr. Sada violate it, the risk of him violating it might cause harm even if Italian authorities can step in after the fact and penalize him for it? I mean, I think that would be the case in almost all grave risk and undertaking cases, right? I mean, there's always that theoretical potential. But I mean, I think what I'm relying on is the fact that the district court did not give that weight and then did not find that risk to be credible. At some point, I think the district court's discretion in analyzing what the risks are and what measures are sufficient to protect the child, absent a clear error and absent respondents or the mother's strong evidence that the father would clearly violate these orders, should be respected. I think... Okay. All right. Thank you, Mr. Min. We're going to hear from Mr. Levy again on rebuttal. Thank you, Your Honor. This is not a theoretical potential we're talking about. The risks here were conclusively proven and found by the court in the first trial. And the subsequent ruling ordering the child back is just inherently irreconcilable with the findings that the trial court made about Mr. Sata's temper, his violence, his inability to understand the consequences of his actions, and his... I mean, but it's the same district court, right? It's the same judge that made those findings who also concluded, seeing all of that evidence, that the ameliorative measures were sufficient and that he was going to comply. So are you saying that it was just schizophrenic? I mean, why are you saying you could accept one set of factual findings, but not the other? Well, because she also, in the first instance, found that the ameliorative measures that were simply his promises that he would do certain things or not do certain things were sufficient. And this court overturned that decision and And so when she got the case back the second time, she didn't take any new evidence. There was nothing about his behavior in Italy that she learned that was able... She secured an order from the Italian court that has jurisdiction over this case. Right, but she did not. But she did not. There was no new evidence presented by Mr. Sata that would give anyone any confidence that his behavior would be modified, and that the protective order would have any deterrent effect. And so I believe... You agree that Mr. Sata did not violate any court order in the last two years? There was no court order. There was nothing to violate. During the period of time of the litigation, I'm talking about the period of... I thought that the district court here had entered an order before the Italian court entered the order. Correct me if I'm wrong. No, there was no protective order here in the United States. I mean, granted that Mr. Sata was on his best behavior in the very limited time he was in the United States, participating in his proceedings and, you know, doing a bare minimum of visitation with the child, but we respectfully submit that his behavior in the United States is effectively irrelevant. Once he's back in Italy... Why exactly is that? Because in Italy... If according to your view, he's going to immediately kill her as soon as they're anywhere in the same country, why isn't that relevant? Because here, she is protected. She has... She's on equal playing field, and he does not have what I would call the home field advantage. She has... She has all my pro bono counsel. She is protected by domestic violence organizations here, and he's here by himself. The playing field in the United States is not a fair representation of what the world will be like if she and the child are back in Italy, where she has language deficiency. She has... He has an entire infrastructure of friends and wealth and ability to deal with the court system, and she is at a complete disadvantage there, and so I think the fact that he was able to control himself for the minimum amount of time that he was in the United States does not give a fair view into what will happen in the stressful situation of the ongoing custody proceedings, the visitations, and the like, where those stressful situations are what trigger his uncontrollable temper. If I may, I appreciate that I'm over my time limit. I can make one last point. I think we should step back and think about what this case would stand for if the district court's decision is upheld. You have a mother and a child who fled to the United States, moved into a domestic violence shelter, proved in a court of law by clear and convincing evidence that she was repeatedly and viciously abused and that her child was at grave risk of harm, and all that has to happen for her to be sent home and for the child to be sent back in spite of that grave risk is the petitioner agreeing to protective order and paying some money. The grave risk exception will be gone if that's all that has to happen for a victim of domestic violence. Thank you, Mr. Levy. Sorry, Judge Winter, do you have a question? Yeah, this last point. The prior panel was also concerned about the interest of the Italian courts in this matter, whether they would take any action. That has been somewhat alleviated, has it not? No. The Italian courts have entered a protective order that the parties were directed to request from the Italian courts. As I said, we are not here to ask this court to pass judgment on the ability of the Italian courts and the competency of the Italian courts. The basis of our appeal and of our position below is about the character of the petitioner. We are not asking this court to find that the Italian court is or is not capable of enforcing its own orders. The issue here is whether or not the petitioner has the character to comply with that order, no matter what the Italian court does. And we think here that the evidence... Thank you. I think we have the argument. Thank you, Mr. Levy. The case is submitted. Thank you.